# IN THE COURT OF APPEALS OF IOWA

No. 18-1735
Filed November 27, 2019

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**VICKIE JO WILLIAMS,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Guthrie County, Terry R. Rickers,

Judge.


Vickie Williams appeals the district court's denial of her motion to suppress.

**AFFIRMED.**


James S. Nelsen of James Nelsen PLC, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.


Heard by Vaitheswaran, P.J., and Potterfield and Mullins, JJ.

**VAITHESWARAN, Presiding Judge.**

A Guthrie County deputy sheriff was on duty in a remote area around Panora when he saw headlights at a distance. The headlights approached him in the opposite lane and continued on. Moments later, the deputy observed an apparently occupied car in a parking lot of a cell phone tower operation. He stopped behind the car, approached the driver's side, and identified the sole occupant as Vickie Williams.

The deputy knew Williams from prior interactions with her and specifically knew she lacked a valid driver's license. Williams denied she drove to the site, stating she came with a friend, exited the car briefly after the friend left in another vehicle, and reentered on the driver's side because the passenger side door would not open.

The deputy instructed Williams to step out of the car. After circling the car with a flashlight directed to the interior, he told Williams to sit in the front passenger seat of his police vehicle. He questioned her for approximately thirteen minutes, eliciting an admission that she had methamphetamine in the car. The deputy searched the car and found the methamphetamine.

The State charged Williams with possession of methamphetamine, "having previously been convicted of a drug related offense twice before." *See* Iowa Code § 124.401(5) (2017). Williams moved to suppress the evidence. The district court denied the motion and, following a trial on the minutes of testimony, found Williams guilty of possession of a controlled substance (methamphetamine), third offense. The court imposed judgment and sentence. On appeal, Williams challenges the district court's ruling on her suppression motion.

The Fourth Amendment to the United States Constitution and article 1, section 8 of the Iowa Constitution protect a person against unreasonable searches and seizures. U.S. Const. amend. IV; Iowa Const. art. I, § 8; *State v. Brown*, 930 N.W.2d 840, 845, 846 (Iowa 2019). Williams does not argue for a different interpretation of the Iowa Constitution than interpretations of the United States Constitution. Accordingly, we will use the same analysis for both. *See State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008); *cf. State v. Ingram*, 914 N.W.2d 794, 801 (Iowa 2018) (considering state constitutional argument under a separate framework where the defendant "specifically urged us to follow a different approach . . . under the Iowa Constitution than has been employed by recent cases of the United States Supreme Court").

"In order for the Fourth Amendment to apply in this case, there must first be a 'seizure.'" *State v. Wilkes*, 756 N.W.2d 838, 842 (Iowa 2008). An officer "seizes" a person when the officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *State v. Harlan*, 301 N.W.2d 717, 719 (Iowa 1981) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)); *see also State v. McGee*, 381 N.W.2d 630, 631 (Iowa 1986) ("A seizure occurs when the officer has in some way restrained the liberty of a citizen by means of physical force or a show of authority."). "Whether a 'seizure' occurred is determined by the totality of the circumstances." *Wilkes*, 756 N.W.2d at 842. Factors supporting a finding of a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's

request might be compelled." *Id.* at 842–43 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Citing *Wilkes*, *Harlan*, and *McGee*, the district court stated, "It is not a seizure or stop when an officer simply pulls up near an already stopped vehicle in a remote area, or if the officers approach a stopped vehicle in a remote area." Williams takes issue with the court's determination. In her view, "there was a seizure in this matter."

Our de novo review of the record, which includes a video and audio recording of the encounter, reveals the following pertinent facts. The deputy did not activate his lights as he turned into the cell tower's driveway. He parked behind the car but "slightly offset" his vehicle to leave "a path of egress" because, in his view, he knew "the case law on that topic." After approaching the car, he asked Williams "what she was doing." "She stated she was waiting for a friend to come back." The deputy "presumed she probably drove" to the site "since she was in the driver's seat." Williams volunteered that she did not drive to the site. The deputy asked Williams for her license, registration, and insurance. Williams had none of the requested paperwork. The deputy instructed Williams to "step out" of the car. When asked what prompted him to do so, he testified Williams' "evasive answers to questions" gave him pause. He elaborated: "I didn't know what was going on at this point, if there was a burglary at the cell phone tower, maybe copper being stolen or [a] trespassing situation . . . . I didn't know what was going on so I wanted to speak to her further." Williams complied with the instruction. As noted, the deputy proceeded to walk around the car with his flashlight, directed Williams

to sit in the front passenger seat of his patrol car, returned to the driver's seat, and continued to question her.

During the questioning, the deputy commented, "Well Vickie you have to admit this seems a little bit strange." After Williams again explained how she ended up in the driver's seat, the deputy remarked, "Vickie, you know I'm not dumb." He asked her if she was doing drugs and whether there was anything illegal in the car. He followed up with, "[S]o if I search the vehicle is there anything I'm gonna find in there?" Williams responded, "There shouldn't be." The deputy countered, "Shouldn't be or isn't?" Williams responded, "There is not. I promise you there is nothing in that vehicle." Williams repeated her explanation of what she was doing at the scene. The deputy responded, "You realize how suspicious this sounds." Williams broke down and begged the deputy not to arrest her. The deputy asked, "Do you mind if I search this vehicle?" Williams explained that the car was not hers. After a further exchange, the deputy asked, "Is there going to be meth in the vehicle?" Williams responded, "No." The deputy persisted and, fifteen minutes and sixteen seconds into the encounter, Williams said there was a meth pipe and methamphetamine in the vehicle. She told the deputy the items were in her bag.

Based on these facts, we agree with the State that there was no Fourth Amendment seizure when the deputy approached the car and initially questioned Williams about her reason for being there. The car occupied by Williams was already stopped, the deputy did not activate his lights, and his vehicle technically gave the defendant a path of egress.[1] *See Wilkes*, 756 N.W.2d at 844 ("The fact

---

[1] The deputy conceded he would have arrested Williams for driving with a suspended license had she attempted to drive away. But he stated, "She could have walked away."

that [the officer] parked behind the vehicle driven by Wilkes also does not convert the encounter into a seizure."); *State v. Fogg*, No. 18-0483, 2019 WL 1933993, at *2–3 (Iowa Ct. App. May 1, 2019) (finding no seizure where police vehicle did not "*wholly* block[] the defendant's ability to leave" and the officer did not use sirens or flashing lights, did not draw his weapon or touch the defendant and used a casual non-aggressive tone in questioning the defendant); *State v. Mathis*, No. 14-0861, 2015 WL 1817111, at *3 (Iowa Ct. App. Apr. 22, 2015) (finding no seizure where the officers did not stop the vehicle, did not have their lights or sirens on, and the defendant's ability to drive away was not impaired); *cf. State v. Coffman*, 914 N.W.2d 240, 253 (Iowa 2018) (citing State's concession there was a seizure where officer activated his overhead lights and pulled behind a vehicle stopped on the side of a highway early in the morning).

Circumstances arguably changed when the deputy ordered Williams into his vehicle. At that juncture, a reasonable person might not have felt "free to decline the officer['s] requests or otherwise terminate the encounter." *State v. Smith*, 683 N.W.2d 542, 547 (Iowa 2004) (citations omitted); *see State v. Salcedo*, ___ N.W.2d ___, ___ (Iowa 2019) ("The detention of an individual during a traffic stop, even if brief and for a limited purpose, is a seizure within the meaning of the Fourth Amendment."). But, in *State v. Aderholdt*, 545 N.W.2d 559, 563–64 (Iowa 1996), the court upheld an investigatory detention, including a request "that the driver sit in the patrol car." In light of that precedent, we conclude the deputy's order to have Williams sit in his police vehicle did not amount to a seizure.

Even if there was a seizure, the deputy had "a reasonable and articulable suspicion . . . that criminal activity was afoot," justifying further questioning of

Williams. *See Smith*, 683 N.W.2d at 546. The deputy discovered Williams around midnight in a remote area on or near private property. The deputy knew Williams to be a drug user with a suspended license. Williams was alone and in the driver's seat, and the deputy had just witnessed a vehicle driving away from the area. Further investigation was needed to determine whether Williams was involved in criminal activity. *See State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002) ("The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning."). Williams' suspicious responses to the deputy's questions provided further impetus for continued questioning. *See Salcedo*, ___ N.W.2d at ___, 2019 WL 5849005, at *5 ("The reasonable investigation, however, may be expanded to satisfy suspicions of criminal activity unrelated to the traffic infraction based upon responses to reasonable inquires." (citing *Aderholdt*, 545 N.W.2d at 564)). We conclude the district court appropriately denied Williams' suppression motion on the basis of reasonable suspicion.

In reaching this conclusion, we have considered Williams' argument that the deputy unduly prolonged the stop. *See In re Pardee*, 872 N.W.2d 384, 396 (Iowa 2015). In *Pardee*, the court concluded no individualized suspicion existed without the delay. *Id.* The court reasoned that there were no inconsistencies in the occupants' story and the trooper did not receive criminal histories for the occupants until after the stop was impermissibly prolonged. *Id.* at 396–97. Here, in contrast, the deputy was well aware of Williams' history of drug use, tipping the balance on reasonable suspicion in favor of the State. *See id.* at 397 (electing not to decide "if the criminal histories might have tipped the balance on reasonable suspicion");

*cf. Salcedo*, ___ N.W.2d at ___, 2019 WL 5849005, at \*6 ("At the conclusion of the first conversation with Salcedo, the only additional factor Deputy O'Hare developed as a possible red flag of other criminal activity was Salcedo's odd travel plans.").

In denying the suppression motion, the district court also relied on the community-caretaking exception to the warrant requirement. In light of our conclusion that reasonable suspicion supported the seizure, we need not address the community-caretaking exception.

Williams finally argues "the fact[s] and circumstances surrounding the continued detention and questioning" of her "amounted to custodial interrogation," triggering an obligation to provide *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). "The only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his [or her] situation." *See State v. Turner*, 630 N.W.2d 601, 607 (Iowa 2001) (citation omitted).

There is no question the deputy directed rather than requested Williams to get into his vehicle. But his tone after Williams situated herself in the squad car was conversational, albeit punctuated with statements of incredulity. In a vacuum, those statements might be viewed as coercive. However, knowing Williams' history as the deputy did it was reasonable to push harder for answers. We conclude Williams was not in custody when the deputy questioned her in the police vehicle. *See State v. Ewalt*, No. 17-1189, 2018 WL 5292090, at \*4 (Iowa Ct. App. Oct. 24, 2018) ("Ewalt agreed to get in the patrol car, and he placed himself in the front, passenger seat. While he sat there, the doors of the patrol car remained unlocked. Based on the totality of the circumstances, the reasonable person in Ewalt's position would not have believed he was in police custody."); *State v. Page*,

No. 16-1404, 2017 WL 4049495, at *2 (Iowa Ct. App. Sept. 13, 2017) (concluding a reasonable person would have found that the defendant was not in custody, where an officer asked him to come back to his squad car to sit while paperwork was processed and he was questioned about his drug use while in the front passenger seat of the squad car); *State v. Plager*, 2004 WL 144122, at *3 (Iowa Ct. App. Jan. 28, 2004) ("The mere fact that [the officer] asked [the defendant] to come back to his patrol car, while he checked the status of his driver's license, did not transform an ordinary traffic stop into custodial interrogation.").

We affirm the district court's denial of Williams' suppression motion and her judgment and sentence.

**AFFIRMED.**