# IN THE COURT OF APPEALS OF IOWA

No. 19-1857
Filed December 16, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**KHALEN RICHARD PRICE WILLIAMS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

The defendant appeals his conviction, contending his motion to suppress should have been granted. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Vaitheswaran and Greer, JJ.

**GREER, Judge.**

As a rear-seat passenger in a Lyft[1] vehicle whose driver was pulled over for traffic violations, Khalen Williams challenges the police officers' actions leading to a warrantless search that resulted in his criminal conviction. Williams appeals, arguing that the court erred in denying his motion to suppress evidence obtained during the warrantless search and seizure of his person. Williams raises three arguments: (1) the officers lacked reasonable suspicion to conduct a pat down search of his person for weapons; (2) his admission to possessing a firearm was a product of custodial interrogation without the benefit of *Miranda* warnings and should have been suppressed; and (3) we should decline to follow *Maryland v. Wilson*, 519 U.S. 408, 415 (1997), which holds that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop," under the Iowa Constitution. He directs us to the case law from several other states that require either reasonable suspicion of criminal activity or reasonable suspicion that a passenger is armed and dangerous before an officer can order a passenger out of a vehicle.

---

[1] Lyft is a "transportation network company" defined under Iowa Code section 321N.1(5) (2020) as

> a corporation, partnership, sole proprietorship, or other entity that operates in this state and uses a digital network to connect transportation network company riders to transportation network company drivers who provide prearranged rides. A transportation network company is not deemed to control, direct, or manage a transportation network company driver that connects to its digital network, or the driver's personal vehicle, except as agreed to by the company and the driver pursuant to a written contract.

Lyft drivers use their "personal vehicle to offer or provide prearranged rides to transportation network company riders upon connection through a digital network controlled by a transportation network company in return for compensation or payment of a fee." Iowa Code § 321N.1(6)(b).

**Facts and Proceedings.**

In late hours of February 14, 2019, Williams was a passenger in a Lyft vehicle when that vehicle was stopped by Officer Brian Buck of the Des Moines Police Department. Officer Buck initiated the stop because of multiple traffic violations by the Lyft driver: speeding, failure to stop at a stop sign, a malfunctioning brake light, and an unreadable license plate. Officer Buck asked the Lyft driver for identification. Likewise, Officer Buck asked Williams for his name, date of birth, and the last four digits of his social security number. Williams complied. Officer Buck returned to his patrol car to check for warrants, as is his standard practice. There were no warrants outstanding for either Williams or the Lyft driver. Officer Brandon Holtan arrived on the scene to assist Officer Buck shortly after the Lyft driver was stopped and took position outside the rear passenger side of the vehicle where Williams was sitting.

Officer Holtan recognized Williams's name from a previous encounter where he tried to pull over Williams's vehicle for a minor traffic offense. In that interaction, Williams eluded Officer Holtan on foot while holding a firearm, was arrested, and was later charged with and convicted of felony eluding and illegal possession of a firearm. This encounter took place in December 2017, fourteen months before the events of this case. Officer Holtan also had knowledge that Williams was arrested for eluding another officer in November 2018, following a foot chase. While Officer Buck checked for warrants, Officer Holtan spoke with Williams while he sat in the Lyft. Officer Holtan's body camera captured no audio of the first minute of this conversation. At the suppression hearing, Officer Holtan summarized the discussion.

I engaged him in conversation regarding those events, and I asked him if he had a firearm. His eye contact—[h]e broke eye contact with me and started to over explain how he was a passenger in a vehicle and tried to distance himself from the vehicle when obviously I could tell he was a passenger in a vehicle, and it was clear he was not associated with the driver because he was sitting in the back seat by himself.

I asked him to step out because I was going to conduct a *Terry* pat; and at that time, his demeanor, which was friendly to this point, I observed his fight or flight response to be activated. And it wasn't the fight or flight response, it was the freezing in time where he was attempting to decide what was going to happen next.

I advised him not to reach because, at that point, I was more aware of his possibility of being armed, and I drew my firearm because I was so concerned. . . . I motioned for Officer Buck to assist me in doing so; and then he was taken into custody, and a firearm was located in his front left jacket pocket.

Officer Holton explained that he drew his weapon because, based partially on past experience with Williams, he thought he was armed and was concerned about his own safety. In response to Officer Holton's command, Williams stepped out of the Lyft with his hands raised. Officer Buck grabbed his arm and asked him if he had a firearm while Officer Holton performed a pat down. Williams admitted he did and told the officers it was in the front left breast pocket of his jacket. Officer Holtan testified, "[I]t was almost simultaneously when I was doing the pat-down when I felt a large heavy metal object in his pocket, which is consistent with a firearm."

The officers arrested Williams and charged him with felon in possession of a firearm, a class "D" felony, and possession of a controlled substance, although the State dropped the latter charge following the suppression hearing. Williams pled not guilty and then moved to suppress all evidence obtained during the search and seizure.

After a hearing, the district court granted the motion to suppress as to a search of Williams's backpack, but it denied the motion as to the search of his

person, discovery of the firearm, and Williams's statements about the firearm. Following that ruling, Williams waived his right to a jury trial and agreed to a trial on the minutes of testimony. He was found guilty on the firearm charge in September. He appeals the denial of his motion to suppress.

**Standard of Review**

Because Williams's motion to suppress was based on constitutional claims, our review of the district court's suppression ruling is de novo. *See State v. Gaskins*, 866 N.W.2d 1, 6 (Iowa 2015) (citing *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011)). "We independently evaluate the totality of the circumstances found in the record, including the evidence introduced at both the suppression hearing and at trial." *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010). "Where the defendant alleges the district court improperly refused to suppress statements made in violation of his *Miranda* rights, our review is de novo." *State v. Miranda*, 672 N.W.2d 753, 758 (Iowa 2003).

**Error Preservation**

Williams's claim that the officers lacked reasonable suspicion to search his person is preserved by the district court's denial of his motion to suppress. *See State v. Naujoks*, 637 N.W.2d 101, 106 (Iowa 2001). In his motion to suppress, Williams cited the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and made a passing reference to article I, sections 8, 9, and 10 of the Iowa Constitution in the summary paragraph. Williams sought to distinguish this case from *Wilson* at the suppression hearing. He argued that it was improper for Officer Buck to interact with Williams at all during the stop, reasoning the privacy interest of a paying passenger in a ride-sharing vehicle is greater than a passenger

in a personal vehicle that has some connection to the driver.[2] The State argued in its resistance to the motion to suppress, and the district court agreed in its ruling, that *Wilson* automatically allows an officer to order a passenger out of a validly stopped vehicle.

In Williams's appellate brief, many pages are dedicated to a comprehensive and thoughtful analysis of other states' treatment of *Wilson.* But other than a minimal reference to article 1, section 8 of the Iowa Constitution in the motion to suppress and his attempt at the suppression hearing to distinguish these facts from *Wilson*, Williams made no argument and the court did not rule on the question of any departure from federal precedent on this constitutional issue.[3] As a general rule, "[i]ssues not raised before the district court, including constitutional issues, cannot be raised for the first time on appeal." *State v. McCright*, 569 N.W.2d 605, 607 (Iowa 1997). Because this issue was not preserved for appeal, we apply

---

[2] Williams mentioned this argument in passing during his oral argument to this court, and his appellate brief refers to Officer Holtan's acknowledgment that Lyft customers may be confused as to why they would be investigated when the driver they hired was pulled over for a traffic offense. But Williams did not sufficiently develop the argument that customers in a hired vehicle have different rights than passengers like those contemplated in *Wilson*, so this issue is not properly before us on appeal.

[3] When seeking adoption of a new constitutional standard, Justice Appel has said:

> [C]ounsel should do more than simply cite the correct provision of the Iowa Constitution. When fashioning an interpretation of a state constitutional provision independent of federal case law, the adjudicative process is best advanced on reasoned argument which has been vetted through the adversarial process. As a result, because of our prudential concern that the issue may not be fully illuminated without a developed record and briefing, we generally decline to consider an independent state constitutional standard based upon a mere citation to the applicable state constitutional provision.

*State v. Effler*, 769 N.W.2d 880, 895 (Iowa 2009) (Appel, J., specially concurring).

*Wilson* case law as written and decline to reach the merits of Williams's claim the Iowa Constitution requires a different interpretation. *See also State v. Coleman*, 890 N.W.2d 284, 303 (Iowa 2017) (Waterman, J., dissenting) (accepting an unpreserved novel interpretation of state constitution creates "perverse incentive to lay in the weeds in district court," deprives the State of an opportunity to develop a different record, and deprives district court of the opportunity to rule on the novel claim). Because Williams did not re-raise his claim that *Wilson* does not apply to him as a customer in the vehicle (as opposed to a passenger) and because we apply the standard announced in *Wilson*, William's fails to show the officers committed a constitutional violation.

**Was There Reasonable Suspicion to Justify a Pat-Down for Weapons?**

Here, both parties agree that the initial stop of the Lyft was valid and that the detainment of Williams constituted a seizure under article I, section 8 of the Iowa Constitution and the Fourth Amendment of the United States Constitution. They also agree that the pat down of Williams was a search. The main dispute is whether Officers Buck and Holtan had reasonable suspicion that Williams was armed and dangerous to justify the pat down of his person. Williams characterizes his behavior as an innocent passenger in a Lyft vehicle causing no harm. And there are limits to searches and seizures by the police.

> The Fourth Amendment to the United States Constitution protects persons from unreasonable searches and seizures and requires a search warrant to be supported by probable cause. The Iowa Constitution similarly protects persons from unreasonable searches and seizures. Warrantless searches and seizures are per se unreasonable unless they fall under one of the recognized exceptions to the warrant requirement.

*State v. Baker*, 925 N.W.2d 602, 610 (Iowa 2019) (citations omitted). It is well-established under both the Fourth Amendment and article I, section that "[p]olice are allowed to pat down a suspect if they have reasonable suspicion that a crime is being or is about to be committed. Police may also do a pat down if there is reasonable suspicion that the person is armed and the officer's safety is in danger." *State v. Bergmann*, 633 N.W.2d 328, 332-333 (Iowa 2001) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

As to automobile seizures, "The Supreme Court concluded that officers who conduct routine traffic stops may engage in pat-downs of a driver and any passenger upon reasonable suspicion that they are armed and dangerous." *Coleman*, 890 N.W.2d at 289 (citing *Arizona v. Johnson*, 555 U.S. 323, 332 (2009)). The policy undergirding *Terry* stops and pat downs in the automobile context is officer safety. *Id.* at 300 (recognizing that "officer safety is a legitimate and weighty interest in the context of traffic stops." (citation omitted)). Reasonable suspicion exists "when the officer, pointing to specific and articulable facts, reasonably believes under all the circumstances that the suspicious person presents a danger to the officer or to others." *State v. Riley*, 501 N.W.2d 487, 489 (Iowa 1993) (citation omitted). We evaluate reasonable suspicion case by case and no one factor is dispositive, but nervousness, evasiveness, lying, and past experience with a suspect are all factors to consider. *See Bergmann*, 633 N.W.2d at 332.

Still, Williams was a paying passenger in a Lyft vehicle stopped by Officer Buck because of multiple traffic violations by the driver. Officer Buck spoke with both the driver and Williams and asked for names and identification, as is his

standard practice. Officer Buck stated at the suppression hearing he had no concerns about any weapons, drugs, or criminal activity when he went to his patrol car to check for warrants.

Just after the initiation of the stop, Officer Holtan arrived to assist Officer Buck. Officer Holtan recognized Williams's name and recalled an incident fourteen months prior where Williams eluded him while carrying a firearm. In addition, Officer Holtan had knowledge that Williams was arrested by another officer in November 2018 for eluding following a foot chase. With this in mind, Officer Holtan asked Williams about those past incidents and asked if Williams had a firearm on his person.[4] Officer Holtan testified he observed a change in Williams after he asked whether Williams had a firearm. According to Officer Holtan, Williams broke eye contact and began over-explaining that he was just a passenger. Even more, Officer Holtan observed Williams's demeanor change to "freezing in time" to more of a "fight or flight response." So, Williams's demeanor, his hand movements suggesting he was reaching for something in his coat pocket, along with Officer Holtan's past experience with him, led Officer Holtan to believe Williams was armed and potentially dangerous. At that point Officer Holtan decided to perform a pat down for weapons and ordered Williams to exit the Lyft. The officer's main concern was safety. *See Terry*, 392 U.S. at 27 (holding an officer may make a protective, warrantless search of a person when the officer, pointing to specific and articulable facts, reasonably believes under all the circumstances that the suspicious person presents a danger to the officer or to others).

---

[4] Officer Holtan's bodycam footage did not record audio for the first minute of his interaction with Williams.

Based on the totality of the circumstances, we find specific and articulable facts supported Officer Holtan's reasonable suspicion, which justified the pat-down. *See Bergmann*, 633 N.W.2d at 333 (finding that reasonable suspicion of wrongdoing to conduct a pat down can be deduced from many factors including the persons' nervousness, evasiveness, and past experience with the suspect). Thus, we find no violation of the Fourth Amendment or article I, section 8 of the Iowa Constitution, and affirm the district court's denial of Williams's motion to suppress evidence of the firearm.

**Was There a *Miranda* Violation Involving the Admission to Possession of a Firearm?**

Williams argues that his admission about the firearm stemmed from custodial interrogation without first being read his *Miranda* rights, and therefore it should have been suppressed. In its brief, the State confirmed it was "not separately rely[ing] on Williams'[s] admission in support of the weapons pat-down." Because we find specific and articulable facts independent of William's admission supported Officer Holton's reasonable suspicion and the pat-down, we decline to address Williams's *Miranda* claim. In other words, we agree with the State that there was reasonable suspicion to pat-down Williams regardless of his admission.

**Conclusion.**

We affirm the denial of the motion to suppress. For the reasons outlined above, we affirm Williams's conviction and sentence.

**AFFIRMED.**